UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

THE POWER AUTHORITY OF THE
STATE OF NEW YORK EX REL. SOLAR
LIBERTY ENERGY SYSTEMS, INC.,

              Plaintiff,

      v.

ADVANCED ENERGY INDUSTRIES,
INC.,

              Defendant.

_____

          19-CV-1542-LJV
          DECISION & ORDER

On October 23, 2018, the plaintiff, the Power Authority of the State of New York

("Power Authority"), by and through a *qui tam* relator, Solar Liberty Energy Systems,

Inc. ("Solar Liberty"), filed an amended complaint under the New York False Claims Act

("NYFCA") in New York State Supreme Court, Erie County. Docket Item 1-5. On

November 15, 2019, the defendant, Advanced Energy Industries, Inc. ("Advanced

Energy"), removed the action to this Court based on diversity jurisdiction. Docket Item

1; *see* 28 U.S.C. § 1332.

On December 6, 2019, Solar Liberty moved to remand this matter to state court.

Docket Item 7. A week later, Advanced Energy moved to dismiss for failure to state a

claim. Docket Item 11. On January 3, 2020, Solar Liberty responded to the motion to

dismiss and cross-moved to amend its complaint, Docket Item 14, attaching a proposed

second amended complaint, Docket Item 14-2. That same day, Advanced Energy

responded to Solar Liberty's motion to remand. Docket Item 13. On January 27, 2020,

both parties replied in support of their motions, and Advanced Energy responded to

Solar Liberty's cross-motion to amend.  Docket Items 19 and 20.  And on February 6, 2020, Solar Liberty replied in support of its cross-motion to amend.  Docket Item 21.

This Court held oral argument on April 28, 2020, and reserved decision.  Docket Item 27.  For the reasons that follow, this Court denies Solar Liberty's motion to remand; denies Advanced Energy's motion to dismiss; and grants Solar Liberty's motion to amend.  Solar Liberty shall file its second amended complaint **within seven days of the date of this decision and order**.

## BACKGROUND

The first amended complaint tells the following story.[1]  Solar Liberty develops and installs "renewable energy technologies in the United States and has substantial expertise with photovoltaic electric generation systems, commonly referred to as solar systems."  Docket Item 1-5 ¶ 8.  Advanced Energy makes and sells "solar inverters," which "are an integral component of solar systems."  *Id.* ¶ 9.  More specifically, "[i]nverters convert the variable voltage direct current (DC) output of a photovoltaic (PV) solar panel into fixed voltage alternating current (AC)," which "can then be incorporated into a local power grid and used to decrease the electric demand of the local solar photovoltaic system owner."  *Id.*

From approximately November 2014 through August 2015, "Solar Liberty entered into a series of related contracts [with the Power Authority (the 'NYPA Contracts')] that

---

[1]  On a motion to dismiss, the Court must "accept[ ] all factual allegations as true and draw[ ] all reasonable inferences in favor of the plaintiff."  *Trustees of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016) (citing *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 179 (2d Cir. 2014)).

called for the design, engineering, procurement, and construction of solar systems to be installed on the roofs of approximately 16 public schools located throughout New York City ('NYC Public School Solar Systems')."  *Id.* ¶ 10.  To fulfill the NYPA Contracts, "Solar Liberty needed to procure solar inverters."  *Id.* ¶ 11.

"Through a purchase order numbered 1587 and dated December 18, 2014, . . . Solar Liberty purchased . . . twenty-two (22) '3TL 20kW—Gen 1 three-phase string inverters' and 'forty-one (41) 3TL 24kW—Gen 1 three-phase string inverters'" from Advanced Energy; and "[t]hrough [a] purchase order numbered 1806 and dated August 27, 2015, . . . Solar Liberty purchased . . . an additional sixteen (16) '3TL 20kW—Gen 1 three-phase string inverters' and fifty (50) '3TL 24kW—Gen 1 three-phase string inverters'" from Advanced Energy.  *Id.* ¶¶ 12-13.  Solar Liberty paid for these purchases "with funds received from the New York Power Authority pursuant to the NYPA Contracts."  *Id.* ¶ 14.

Solar Liberty then installed the inverters that it purchased from Advanced Energy "as components of the NYC Public School Solar Systems, as part of a joint program undertaken by the New York Power Authority as well as the New York City Department of Citywide Administrative Services, as incentivized by the New York State Energy Research and Development Authority."  *Id.* ¶ 15.  But "[s]oon after installation, [the] inverters began to experience widespread and persistent failures, which . . . resulted in loss of power generation and significant and ongoing repair costs."  *Id.* ¶ 16.

Advanced Energy was well aware of "the widespread and persistent defects associated with [its] inverters," but it "actively concealed its knowledge of the defects associated with its inverters when it sold them to . . . Solar Liberty."  *Id.* ¶¶ 17, 22.  More

specifically, "Advanced Energy knew that the inverters' actual and established product-wide failure rate was approximately 50%." *Id.* ¶ 18.  Yet "Advanced Energy knowingly misrepresented to customers, including to . . . Solar Liberty, that these inverters would experience a product-wide failure rate of approximately 4%." *Id.*

Moreover, "[w]hen Advanced Energy's inverters fail, the top or cap affixed to the element is sometimes forcibly blown off the inverter and can travel a significant distance." *Id.* ¶ 25.  "Advanced Energy was aware that its inverters were prone to failing in this manner" and "was aware that Relator Solar Liberty intended to use the inverters for installations on the rooftops of school buildings." *Id.* ¶¶ 26-27.  But it never informed "Solar Liberty of the known hazards associated with the caps blowing off the tops of the inverters." *Id.* ¶ 28.

Additionally, "Advanced Energy represented to Solar Liberty that the inverters were suitable for use in connection with electrical systems that are commonplace in the United States," when, in fact, "the inverters had been engineered for use in European markets where electrical systems are quite different from those in the United States." *Id.* ¶ 29.  Advanced Energy also "represented to Solar Liberty that the inverters had a 500 Volt DC maximum rating," when "certain of the Advanced Energy inverters were designed to have internal DC Voltage up to 1000 Volts during standard operation." *Id.* ¶ 30.  "The presence of such high DC voltage levels in the inverters is due to defects" and "makes the inverters hazardous to those who service them as well as those who live, work, or attend school near locations where the inverters are installed." *Id.* ¶ 31.

"Advanced Energy did not disclose these issues and failures to . . . Solar Liberty, and instead continued to represent to . . . Solar Liberty that the inverters were

merchantable and of good quality, and that any failures could be fixed." *Id.* ¶ 35.  When Solar Liberty contacted "Advanced Energy with complaints and concerns regarding the inverters' pervasive failures, . . . Advanced Energy repeatedly assured . . . Solar Liberty that the problems with the inverters were fixable and would be fixed." *Id.* ¶ 34.  Even worse, "Advanced Energy engaged in a pattern and practice whereby it would represent to customers, including . . . Solar Liberty, that [it] would repair or refurbish faulty or defective inverters that were returned to it by customers when, in point of fact, [it] would make no meaningful effort to repair or refurbish such inverters and would instead simply return the faulty or defective inverters to customers after a period of time had passed." *Id.* ¶ 43.  "This intentionally deceptive charade damaged customers of Advanced Energy, including . . . Solar Liberty, who were forced to provide labor to service and disconnect the defective inverters, ship them to Advanced Energy, and reinstall the same inverters after they were returned without any credible or practical effort by Advanced Energy to service the inverters." *Id.* ¶ 44.

"Notwithstanding its knowledge that the inverters it was selling to . . . Solar Liberty were defective, . . . Advanced Energy sold approximately 120 inverters to . . . Solar Liberty and accepted payment from" Solar Liberty.  *Id.* ¶ 49.  "In total, the New York City Schools Solar Project gave rise to payments to Advanced Energy of approximately $315,250.00 for the inverters themselves" out of Power Authority funds, "as well as the expenditure of significant amounts of [Power Authority] funds associated with the installation of those inverters."  *Id.* ¶ 52.  "Moreover, the costs associated with replacing Advanced Energy's defective and dangerous inverters will be well over one

million dollars—the replacement inverters themselves will cost approximately

$582,490.00 and the work to install them will total approximately $645,000.00."  *Id.*

## ANALYSIS

### I.    MOTION TO REMAND

Solar Liberty argues that this Court does not have jurisdiction over this matter

because of a procedural deficiency as well as the absence of diversity of citizenship

between the parties.  Docket Item 7-2.  On the latter issue, Solar Liberty says that "the

[p]laintiff and a real party in interest, the Power Authority, is an arm or instrumentality of

the State of New York" and as such "is not a 'citizen' for the purposes of diversity

jurisdiction."  *Id.* at 6.  For the reasons that follow, this Court finds that there is no

procedural deficiency, that the Power Authority is not an arm or instrumentality of New

York State, and that this Court has jurisdiction over this action.

#### A.  The Notice of Removal is Sufficient.

Solar Liberty first contends that Advanced Energy's notice of removal is

inadequate because "Advanced Energy does not expressly allege . . . that the Power

Authority is a citizen of any state, let alone a citizen [of] New York State."  Docket Item

7-2 at 8.  This Court disagrees.

A notice of removal must provide a "short and plain statement of the grounds for

removal."  28 U.S.C. § 1446(a).  Here, the notice of removal states that "Advanced

Energy is a Delaware corporation with its principal place of business [in] Colorado" and

Solar Liberty "is a New York corporation with its principal place of business [in] New

York."  Docket Item 1 ¶¶ 2-3.  The notice adds that Solar Liberty "purports to bring this

*qui tam* action on behalf of the Power Authority," which is "a political subdivision of the [S]tate" and "a fiscally independent public corporation that does not receive State funds or tax revenues or credits." *Id.* ¶ 4 (citations omitted).  The claimed damages total "well over one million dollars." *Id.* ¶ 6 (quoting Docket Item 1-5 ¶ 52).  Thus, the notice assets, "this action could have been filed originally in this Court pursuant to 28 U.S.C. § 1332 in that it is a civil action where the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states." *Id.* ¶ 7.

Advanced Energy's notice provides the requisite "short and plain statement of the grounds for removal." *See* 28 U.S.C. § 1446(a).  Although it does not state explicitly that the Power Authority is a citizen of New York State, that assertion is clear from the statement that the Power Authority is "a political subdivision of the [S]tate." Docket Item 1 ¶ 4.[2]  Accordingly, the Court finds that the notice of removal is not deficient.

### B.  The Power Authority Is a Real Party in Interest.

In opposing the motion to remand, Advanced Energy argues that the Power Authority is not a real party in interest in this case and its citizenship therefore does not affect this Court's jurisdiction. *See* Docket Item 13 at 11-15.  According to Advanced Energy, the first amended complaint "does not plead any controversy between the Power Authority and Advanced Energy, nor facts showing that the Power Authority suffered damages or is otherwise entitled to a recovery." *Id.* at 11.  Instead of describing a "fraud on the government," Advanced Energy says, the first amended

---

[2]  As explained in more detail below, "an arm of the state" is not a citizen of that state for diversity jurisdiction purposes, whereas "an independent political subdivision" is a state citizen. *See Treasurer of Conn. v. Fortsmann Little & Co.*, No. 3:02CV519(JBA), 2002 WL 31455245, at *2 (D. Conn. Oct. 15, 2002).

complaint "describes a dispute between two private parties."  *Id.*  Solar Liberty counters

that "the State of New York, through its instrumentality[,] the Power Authority, maintains

virtually identical interests in protecting its school children and citizens from a public

hazard and in preventing the perpetuation of fraudulent schemes, thus making it a real

party in interest."  Docket Item 20 at 8.

The parties' dispute over whether the Power Authority is a real party of interest

rises and falls with a parallel question: whether this case was properly brought under

the NYFCA or whether—as Advanced Energy claims—it is actually a private contract

dispute masquerading as a false-claims case.  Based on this Court's finding below that

Solar Liberty states a claim under the NYFCA, *see infra* Section II.B, it likewise finds

that the Power Authority is a real party in interest in this case.  Accordingly, this Court

analyzes whether the Power Authority is a citizen of New York State for the purposes of

diversity jurisdiction.

### C.  The Power Authority Is Not an Arm or Instrumentality of the State.

A state—or an entity that is an arm or instrumentality of a state—is not a citizen

of any state and therefore destroys diversity of citizenship.  *See Martelli v. Niagara Falls*

*Bridge Comm'n*, No. 13-CV-652-A, 2013 WL 3761550, at *4 n.1 (W.D.N.Y. July 16,

2013) ("A state, or an arm or alter ego of a state, is not a citizen of the state for

purposes of diversity jurisdiction." (citing *Moor v. Alameda Cty.*, 411 U.S. 693, 717

(1973)).  Here, Solar Liberty argues that the Power Authority is an arm of New York

State, thus defeating diversity and depriving this Court of jurisdiction.

"The critical diversity determination, distinguishing between an independent entity

and an 'arm or alter ego', asks whether or not ' . . . the suit is, in effect, against the state

8

. . . .'" *Treasurer of Conn. v. Fortsmann Little & Co.*, No. 3:02CV519(JBA), 2002 WL

31455245, at *2 (D. Conn. Oct. 15, 2002) (quoting *State Highway Comm'n of Wyo. v.

Utah Constr. Co.,* 278 U.S. 194, 194 (1929)); *see also Krisel v. Duran,* 386 F.2d 179,

181 (2d Cir.1967) (per curiam) ("For the purpose of diversity jurisdiction, the

determinative factor is whether the state is the real party in interest.").  "A parallel and

essentially equivalent inquiry extends a state's Eleventh Amendment sovereign

immunity to entities considered alter egos or 'arms of the state,' but not to independent

political subdivisions such as counties and municipal corporations."  *Fortsmann*, 2002

WL 31455245, at *2 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S.

274, 280 (1978)).  "Accordingly, for both diversity and immunity purposes, courts use

the same criteria to evaluate whether an entity is an arm of the state or rather an

independent political subdivision."  *Id.* (citing *Mt. Healthy*, 429 U.S. at 280-81).

In the Second Circuit, the following six factors determine whether an entity is an

arm of the state:

> (1) how the entity is referred to in its documents of origin; (2)
> how the governing members of the entity are appointed; (3)
> how the entity is funded; (4) whether the entity's function is
> traditionally one of local or state government; (5) whether the
> state has a veto power over the entity's actions; and (6)
> whether the entity's financial obligations are binding upon the
> state.

*McGinty v. New York*, 251 F.3d 84, 95-96 (2d Cir. 2001) (citing *Mancuso v. N.Y.S.*

*Thruway Auth.*, 86 F.3d 289, 293 (2d Cir. 1996)).  "If these factors point in one direction,

the inquiry is complete.  If not, a court must ask whether a suit against the entity in

federal court would threaten the integrity of the state and expose its treasury to risk."  *Id.*

(citing *Mancuso*, 86 F.3d at 293).  "If the answer is still in doubt, a concern for the state

fisc will control." *Id.* (citing *Hess v. Port Auth. Trans-Hudson Corp.,* 513 U.S. 30, 480-49 (1994)).

For the reasons that follow, this Court finds that the *McGinty* factors do not all point in one direction here.  But because a suit against the Power Authority would not "threaten the integrity of the state and expose its treasury to risk," the Power Authority is not an arm of New York State.  Accordingly, there is diversity between the parties, and this Court has jurisdiction over this action.

### 1.    How the Entity Is Referred to In Its Documents of Origin

The first factor is "how the entity is referred to in its documents of origin."

*McGinty*, 251 F.3d at 95.  New York Public Authorities Law ("NY PAL") § 1002(1) states:

> For the purpose of effectuating the policy declared in section one thousand one of this chapter there is hereby created a *corporate municipal instrumentality of the state* to be known as "Power Authority of the State of New York", in this title referred to as "the authority", which shall be a body corporate and politic, a *political subdivision* of the state, exercising governmental and public powers, perpetual in duration, capable of suing and being sued, and having a seal, and which shall have the powers and duties hereinafter enumerated, together with such others as may hereafter be conferred upon it by law.

*Id.* (emphasis added).  Both parties rely on this statute.  Solar Liberty points to the words "corporate municipal instrumentality of the state," while Advanced Energy relies on the "political subdivision" language.  *Cf. Woods v. Rondout Valley Cent. Sch. Dist. Bd of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006) (explaining that "a governmental entity is entitled to Eleventh Amendment immunity only if 'it is more like an arm of the State, such as a state agency, than like a municipal corporation or other political subdivision'" (quoting *Mancuso,* 86 F.3d at 292)).

Given the inclusion of both the "instrumentality of the state" language (which suggests that the Power Authority is an arm of New York State) and the "political subdivision" language (which suggests that it is not), the documents of origin are ambiguous. Therefore, the Court finds that this factor is neutral.

### 2.    How the Governing Members of the Entity Are Appointed

The second factor is "how the governing members of the entity are appointed." *McGinty*, 251 F.3d at 95. Advanced Energy concedes that this factor supports Solar Liberty's argument for remand. *See* Docket Item 13 at 18 ("Advanced Energy acknowledges that the Power Authority's trustees are appointed by the Governor, by and with the advice of the Senate, *see* [NY PAL] § 1003, and hence, this one factor weighs in favor of finding it to be an arm of the state."). Accordingly, the Court finds that this factor supports remand.

### 3.    How the Entity is Funded

The third factor is "how the entity is funded." *McGinty*, 251 F.3d at 95-96. Solar Liberty points to the following statutory language as evidence that the Power Authority is funded by New York State: "As long as and to the extent that the [Power A]uthority is dependent upon appropriations for the payment of its expenses, it shall incur no obligations for salary, office or other expenses prior to the making of appropriations adequate to meet the same." NY PAL § 1004. But as Advanced Energy observes, "[t]he 'as long as' language recognizes that the Power Authority *may not be funded* by the State of New York and in fact, . . . that is the reality today: the Power Authority is currently not being funded by the State of New York." Docket Item 13 at 19 (emphasis in original). Indeed, Solar Liberty acknowledges that, as a practical matter, the Power

Authority is financially independent and does not receive any funds from New York State.  *See* Docket Item 7-2 at 14 ("Notwithstanding these statutory provisions expressly tying it to the State fisc, it is acknowledged, as a practical matter, that the Power Authority generates revenue from power delivery and transmission services and that those revenues generally allow it to operate on a financially independent basis.").

What is more, "[a]ll appropriations made by the state to the [Power A]uthority shall be treated as advances by the state to the authority, and shall be repaid to it."  NY PAL § 1013.  Thus, even if the Power Authority received funds from New York State, it is statutorily obligated to repay them.  Accordingly, the Court finds that the Power Authority is not "funded" by the State, and this factor cuts against remand.

### 4.    Whether the Entity's Function Is Traditionally One of Local or State Government

The fourth factor is "whether the entity's function is traditionally one of local or state government."  *McGinty*, 251 F.3d at 96.  Solar Liberty points to the following statutory language:

> [T]he projects authorized by this title are for the aid and improvement of commerce and navigation and that such aid and improvement of commerce and navigation and the development, sale and distribution of power is primarily for the benefit of the people of the state of New York . . . and is a public purpose, and the authority shall be regarded as *performing a governmental function* in undertaking such projects and in carrying out the provisions of this title . . . .

NY PAL § 1012 (emphasis added).  Advanced Energy counters that the provision of electricity was not *traditionally* a function performed by the State and cites several cases to that effect.  *See, e.g.*, *Connolly v. Long Island Power Authority*, 30 N.Y.3d 719, 729 (2018) (explaining that "the provision of electrical power" is "a service that traditionally

12

has been provided by private entities in the State of New York"); *Heeran v. Long Island Power Auth.*, 141 A.D.3d 561, 564 (N.Y. App. Div. 2016) ("The provision of electricity has traditionally been a private enterprise in this state . . . .").

In light of the contradiction between the statute and the provision of electrical power historically, this Court finds this factor to be neutral. *Cf. Adler v. S. Orangetown Cent. Sch. Dist.*, No. 05CIV.4835(SCR), 2008 WL 190585, at *5 (S.D.N.Y. Jan. 17, 2008) (finding fourth *McGinty* factor to be neutral because although "Article XI, § 1 of the New York State Constitution . . . requires the State to provide a public education," education has "traditionally been considered a local function").

### 5.   Whether the State Has a Veto Power Over the Entity's Actions

The fifth factor is "whether the state has a veto power over the entity's actions." *McGinty*, 251 F.3d at 96.  The Power Authority may not enter into "[c]ontracts for the sale, transmission and distribution of power and energy" without the governor's approval.  *See* NY PAL §§ 1005(v), 1009(4).  Solar Liberty argues that such contracts "govern the Power Authority's core operations."  Docket Item 7-2 at 16.  Advanced Energy counters that "the state lacks veto power over virtually all other actions of the Power Authority, including the Power Authority's day-to-day operations."  Docket Item 13 at 21.

The Court finds that this factor also is neutral.  Although New York State does not have veto power over many of the Power Authority's activities and decisions—including its day-to-day operations—the contracts that the governor must approve are central to the Power Authority's functioning.  *Cf. Woods*, 466 F.3d at 249 (finding fifth factor to be neutral because "without minimizing the considerable supervisory authority conferred by

13

New York law on the State Commissioner of Education, . . . the Board [of Education] has not convincingly demonstrated that this authority equates to a veto power over the unprotested day-to-day decisions of local boards of education").

### 6.    Whether the Entity's Financial Obligations Are Binding Upon the State

The sixth and final factor is "whether the entity's financial obligations are binding upon the state."  *McGinty*, 251 F.3d at 96.  "The relevant question with respect to this sixth factor is 'whether a judgment against the [Power Authority] would have the practical effect of requiring payments from New York.'"  *Id.* at 99 (quoting *Mancuso,* 86 F.3d at 296).  In *Mancuso,* for example "this factor worked against a finding of immunity because the Thruway Authority was self-sustaining and produced no evidence that it could not satisfy a judgment."  *Id.* (citing *Mancuso,* 86 F.3d at 296).  "In contrast, the Retirement System [in *McGinty* was] not self-sustaining as it require[d] contributions from employees, the state and other participating employers."  *Id.*

Solar Liberty acknowledges that the Power Authority has "no power at any time to pledge the credit of the state nor shall any of its obligations or securities be deemed to be obligations of the state."  Docket Item 7-2 at 17 (quoting NY PAL § 1005(11)).  Nonetheless, Solar Liberty argues that this factor favors remand because "the Power Authority's financial affairs are closely tied to the State fisc."  Docket Item 7-2 at 16.  But the crux of this factor is not whether "the financial affairs are closely tied"; instead, it is whether the State would be *responsible* for the entity's debts.

Here, the Power Authority is a self-sustaining entity.  Even more important, as explained above, it is statutorily obligated to repay any funds it receives from New York State.  *See* NY PAL § 1013 ("All appropriations made by the state to the [Power

A]uthority shall be treated as advances by the state to the authority, and shall be repaid to it."). Because the Power Authority's financial obligations are not binding on the State, this factor cuts against remand.

### 7.    A Suit in Federal Court Would Not Threaten the Integrity of the State and Expose its Treasury to Risk.

All told, three of the *McGinty* factors are neutral, one favors remand, and two cut against remand. As explained above, when the factors do not all "point in one direction, . . . a court must ask whether a suit against the entity in federal court would threaten the integrity of the state and expose its treasury to risk." *McGinty*, 251 F.3d at 96 (citing *Mancuso*, 86 F.3d at 293). Here, the two factors that cut against remand—"how the entity is funded" and "whether the entity's financial obligations are binding upon the state," *id.* at 95-96—demonstrate that the Power Authority is financially independent from New York State and that the State is not responsible for any judgment against the Power Authority.

For that reason, this Court finds that "a suit against [the Power Authority] in federal court would [not] threaten the integrity of [New York State] and expose its treasury to risk." *See McGinty*, 251 F.3d at 96. The Power Authority is therefore not an arm of the State, and this Court has jurisdiction over this action.

## II.    MOTION TO DISMISS AND CROSS-MOTION TO AMEND

Under the NYFCA, a defendant is liable if it "knowingly presents, or causes to be presented[,] a false or fraudulent claim for payment or approval" to the government or if it "knowingly makes, uses, or causes to be made or used, a false record or statement

material to a false or fraudulent claim."  N.Y. State Fin. Law § 189(1)(a)-(b).  A "claim" is

defined as

> any request or demand, whether under a contract or otherwise, for money or property that
>
> (i) is presented to an officer, employee or agent of the state or a local government; or
>
> (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the state or a local government's behalf or to advance a state or local government program or interest, and if the state or local government (A) provides or has provided any portion of the money or property requested or demanded; or (B) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

*Id.* § 188(1)(a).

Advanced Energy moves to dismiss the first amended complaint, arguing that

"nowhere does Solar Liberty identify a single false claim Advanced Energy submitted or

caused to be submitted for payment or approval."  Docket Item 11-1 at 5.  Therefore,

Advanced Energy argues, Solar Liberty has "fail[ed] to plead the *most essential* element

required to state an NYFCA claim."  *Id.* (emphasis in original).  According to Advanced

Energy, "this case should have been brought as a breach of contract or products liability

action . . . in Colorado State Court, as required by the contract between these two

private parties, Solar Liberty and Advanced Energy."  *Id.* at 17.  Advanced Energy adds

that the first amended complaint "also fails to plead with the level of specificity required

for allegations of fraud; fails to allege materiality as to a government payment decision;

and fails to sufficiently allege scienter."  *Id.* at 5 (emphasis omitted).

Solar Liberty responds that it adequately has pleaded that Advanced Energy "made false claims by (1) demanding payment out of government funds (2) under the pretense that (3) its products were reliable, safe, and suitable when, (4) it knew they were not." Docket Item 14-3 at 6. Alternatively, Solar Liberty cross-moves to amend its complaint. *Id.* at 7. It includes a proposed second amended complaint with additional factual detail, which it says "eliminates any doubt on the subject of whether [it] is capable of pleading a NYFCA claim." *Id.* at 22.

### A. Applicable Pleading Standard

As a threshold matter, the parties disagree on whether the heightened pleading standard in Federal Rule of Civil Procedure 9(b) applies to a NYFCA claim that has been removed to federal court. Under Rule 9(b), a complaint alleging fraud "must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *New York ex rel. Khurana v. Spherion Corp.*, No. 15 CIV. 6605 (JFK), 2017 WL 1437204, at *9 (S.D.N.Y. Apr. 21, 2017) (quoting *Wood ex rel. U.S. v. Applied Research Assocs., Inc.*, 328 F. App'x 744, 747 (2d Cir. 2009) (summary order)). Put another way, "Rule 9(b) requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud." *Id.* (quoting *U.S. ex rel. Polansky v. Pfizer, Inc.*, No. 04-cv-0704 (ERK), 2009 WL 1456582, at *4 (E.D.N.Y. May 22, 2009)). "The purpose of this requirement is 'to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, . . . to protect a defendant against the institution of a strike suit, [and] . . . to discourage

the filing of complaints as a pretext for discovery of unknown wrongs." *Id.* at *8

(alteration in original) (quoting *Wood*, 328 F. App'x at 747).

As Advanced Energy observes, courts in this circuit routinely apply Rule 9(b) to

NYFCA claims in federal court. *See, e.g.*, *id.* ("A plaintiff alleging false claims under the

[NYFCA] must plead with particularity the circumstances constituting fraud in

accordance with Federal Rule of Civil Procedure 9(b)." (citing *Gold v. Morrison-Knudsen*

*Co.*, 68 F.3d 1475, 1476-77 (2d Cir. 1995))); *Kane ex rel. U.S. v. Healthfirst, Inc.*, 120 F.

Supp. 3d 370, 382 (S.D.N.Y. 2015) (explaining that claims under the "NYFCA 'fall within

the express scope of Rule 9(b)'" (quoting *Wood*, 328 F. App'x at 747)).

Solar Liberty does not cite any contrary case law.  Instead, it argues that Rule

9(b) should not apply based on the wording of the NYFCA.  Docket Item 14-3 at 11.

More specifically, Solar Liberty notes that the NYFCA provides:

> For purposes of applying rule three thousand sixteen of the
> civil practice law and rules, in pleading an action brought
> under this article the qui tam plaintiff *shall not be required to
> identify specific claims that result from an alleged course of
> misconduct*, or any specific records or statements used, *if the
> facts alleged* in the complaint, if ultimately proven true, *would
> provide a reasonable indication that one or more violations of
> section one hundred eighty-nine of this article are likely to
> have occurred*, and *if the allegations* in the *pleading provide
> adequate notice of the specific nature of the alleged
> misconduct to permit the* state or a local government
> effectively to investigate and *defendants fairly to defend the
> allegations made*.

*Id.* (emphasis in original) (quoting N.Y. State Fin. Law § 192(1-a)).  Thus, Solar Liberty

says, "it is disingenuous for [Advanced Energy] to argue that, having removed this

action to [f]ederal [c]ourt, the [a]mended [c]omplaint should be dismissed for failing to

meet a pleading standard . . . that did not apply to it."  *Id.*

This Court agrees with Advanced Energy that the Rule 9(b) standard applies. As this Court has previously found, "the federal pleading standard applies to a motion to dismiss filed after an action has been removed." *Piechowicz v. Lancaster Cent. Sch. Dist.*, No. 17-CV-845, 2019 WL 6463402, at *2 (W.D.N.Y. Dec. 2, 2019) (citing Fed. R. Civ. P. 81(c)(1)). More specifically, Federal Rule of Civil Procedure 81 states that the federal "rules apply to a civil action *after* it is removed from a state court." *Id.* (emphasis in original) (quoting Fed. R. Civ. P. 81(c)(1)). Rule 81 further states that "[a]fter removal, repleading is unnecessary *unless the court orders it.*" *Id.* (emphasis in original) (quoting Fed. R. Civ. P. 81(c)(2)). Thus, "Rule 81 implicitly acknowledges that there are circumstances in which a state court complaint must be repleaded in federal court—for example, when a defendant has successfully argued in a motion to dismiss that the complaint does not meet federal pleading requirements." *Id.*[3]

Moreover, as noted above, federal courts regularly apply Rule 9(b) to NYFCA claims. *See, e.g.*, *Khurana*, 2017 WL 1437204, at *8; *Kane*, 120 F. Supp. 3d at 382. And Solar Liberty does not cite—nor was this Court able to find—any case in which a federal court declined to apply Rule 9(b) to a NYFCA claim.

Solar Liberty alternatively argues that this Court should "relax[ ]" the Rule 9(b) standard in this case because it has "set[ ] forth a complex and far-reaching scheme, the specifics of which are often known only to the defendant." Docket Item 14-3 at 12 (citing *United States ex rel. Lee v. N. Adult Daily Health Care Ctr.*, 205 F. Supp. 3d 276, 289 (E.D.N.Y. 2016)). But as Advanced Energy observes, "[c]ases that have been

---

[3] Although *Piechowicz* dealt with the plausibility standard under Federal Rule of Civil Procedure 8 rather than the more stringent Rule 9(b) standard, the same principles apply.

afforded the relaxed 9(b) pleading standard have consisted of far greater complexity." Docket Item 19 at 10; *see, e.g.*, *United States ex rel. Smith v. Yale Univ.*, 415 F. Supp. 2d 58, 84 (D. Conn. 2006) (allegations of "thousands of instances" of Medicare claims submitted "over an extended period"); *In re Pharm. Indust. Average Wholesale Price Litig.*, 307 F. Supp. 2d 196, 201-02, 208 (D. Mass. 2004) (allegations that "forty-two pharmaceutical companies fraudulently overstate[d] the published 'average wholesale prices' ('AWP') of . . . 321 drugs"). Thus, this Court finds that the Rule 9(b) pleading standard applies here.

The Court finds, however, that it would be unfair to hold Solar Liberty to a federal pleading standard that did not apply when it drafted its first amended complaint, which it filed in state court. *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires."). Accordingly, this Court grants Solar Liberty's motion to amend and will analyze the allegations in the proposed second amended complaint to determine whether Solar Liberty has stated a viable claim.

### B. Identification of a False Claim Submitted for Payment

Advanced Energy argues that "[n]either the [first amended complaint] nor the [p]roposed [second amended complaint] identifies a single request or demand for money or property by Advanced Energy that was false." Docket Item 19 at 13. This Court disagrees.

The proposed second amended complaint identifies six invoices that Advanced Energy sent to Solar Liberty, including dates, amounts, and invoice numbers. Docket Item 14-2 ¶ 13. Solar Liberty alleges that it paid those invoices "with funds received

from the New York Power Authority pursuant to the NYPA Contracts." *Id.* ¶ 14.

Moreover, Solar Liberty says,

> [b]oth prior to and after its sales of inverters to Relator Solar
> Liberty, Advanced Energy knowingly misrepresented to
> customers, including to Relator Solar Liberty, that these
> inverters "have a great reliability track record" and were
> "highly reliable."  *See* Exhibits A and B hereto (Advanced
> Energy data sheets for 600 Series and 1000 Series inverters).
> As one example, Advanced Energy salesman Joe Ross
> stated to Solar Liberty's President Adam Rizzo telephonically
> in 2014 (before the inverters were purchased, invoiced, and
> paid for) that the inverters had a product wide failure rate of
> only approximately 1% to 2%.  As another example, at various
> times after the inverters started failing, Advanced Energy's
> Brenda Clarke and Jennifer Parnell (among others) stated to
> Solar Liberty's President Adam Rizzo (among others) that the
> inverters' historical failure rate was only approximately 4%.  In
> making those misrepresentations to customers, and to
> Relator Solar Liberty in particular, Advanced Energy knew
> that the inverters' actual and established product wide failure
> rate was approximately 50%—hardly "highly reliable," as
> Defendant Advanced Energy had represented in its data
> sheets for the inverters.  *Id.*

Docket Item 14-2 ¶ 18.  Solar Liberty further contends that

> By invoicing Relator Solar Liberty for the solar inverters which
> were the subject of Relator Solar Liberty's purchase orders,
> Defendant Advanced Energy falsely claimed that the quality
> and nature of the solar inverters it had supplied were
> consistent with the representations it had previously made
> with respect thereto . . . .   Each of its prior false
> representations about the solar inverters were made and
> became part of Advanced Energy's invoices to Relator Solar
> Liberty for the inverters.

*Id.* ¶ 51.

The Court finds that these allegations are sufficient to support Solar Liberty's

claim that Advanced Energy "knowingly present[ed], or cause[d] to be presented[,] a

false or fraudulent claim for payment or approval" under the NYFCA. *See* N.Y. State

Fin. Law § 189(1)(a). As explained above, a "claim" includes

> any request or demand, whether under a contract or otherwise, for money or property that . . . is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the state or a local government's behalf or to advance a state or local government program or interest, and if the state or local government (A) provides or has provided any portion of the money or property requested or demanded; or (B) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

*Id.* § 188(1)(a)(ii). The proposed second amended complaint alleges that Advanced

Energy represented to Solar Liberty—a government contractor—that the solar inverters

had a failure rate of 1%-4%, when in fact Advanced Energy knew that they failed

approximately 50% of the time. Docket Item 14-2 ¶ 18. It identifies instances when

specific Advanced Energy employees misrepresented the failure rate to Solar Liberty.

*Id.* It claims that Advanced Energy then demanded payment from Solar Liberty by

sending six invoices for the product that Advanced Energy had falsely represented was

"highly reliable." *Id.* ¶ 13. And it pleads that Solar Liberty used the dangerous invertors

for a government project and paid for them with funds from the Power Authority. *Id.*

¶¶ 14-15.

These allegations are sufficient even under Rule 9(b)'s heightened pleading

standard, as they "set forth the who, what, when, where and how of the alleged fraud."

*See Khurana*, 2017 WL 1437204, at *9.

### C. Materiality

Advanced Energy next argues that Solar Liberty has failed to "allege that any

false claim by Advanced Energy was material to the Power Authority's decision (or any

state or local government decision) to pay Solar Liberty (which in turn paid Advanced

Energy) for the solar systems."  Docket Item 11-1 at 19.  Again, this Court disagrees.

The proposed second amended complaint alleges that

> [u]pon information and belief, Defendant Advanced Energy's
> false representations, which were adopted by Relator Solar
> Liberty and made by it to [the Power Authority], were also
> material to [the Power Authority] in awarding the [the Power
> Authority] Contracts to Relator Solar Liberty and making
> payment to Relator Solar Liberty, which payments would not
> have been made but for the false representations.  Indeed,
> [the Power Authority] has issued Relator a "Notice of
> Concern—Continued Inverter Issues" outlining the gravity to
> it of the problem (see Exhibit F hereto) and has refused to
> accept the NYC Public School Solar Systems as final or
> complete, instead requiring that the Advanced Energy solar
> inverters be replaced with those of a different manufacturer
> and withholding final payment to Relator Solar Liberty on that
> basis.

Docket Item 14-2 ¶ 53.  In other words, Solar Liberty alleges that the Power Authority

would not have provided Solar Liberty with funds to pay for the inverters but-for

Advanced Energy's misrepresentations.  Such allegations are sufficient to allege

materiality.  Indeed, it defies logic to suggest that the Power Authority would have

provided funds to purchase the solar inverters for school buildings had it known that

they had a 50% failure rate and posed a safety hazard.  *See Universal Health Servs.,*

*Inc. v. United States ex. rel. Escobar*, 136 S. Ct. 1989, 1994 (2016) ("An undisclosed

fact is material if, for instance, '[n]o one can say with reason that the plaintiff would have

signed this contract if informed of the likelihood' of the undisclosed fact." (quoting *Junius*

*Constr. Co. v. Cohen,* 257 N.Y. 393, 400 (1931))).

Advanced Energy contends that the Power Authority did not suffer any financial

loss, relying on the proposed second amended complaint's allegation that the Power

Authority has withheld payment from Solar Liberty.  Docket Item 19 at 8.  But Solar Liberty alleges only that the Power Authority has "withh[eld] *final* payment" for the project as a result of the defective inverters, Docket Item 14-2 ¶ 53 (emphasis added); elsewhere, Solar Liberty alleges that it paid for the inverters "with funds received from the New York Power Authority pursuant to the NYPA Contracts."  *Id.* ¶ 14.  And those allegations actually support Solar Liberty's claim that the misrepresentations were material.  *See Escobar*, 136 S. Ct. at 2003 ("[P]roof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement.  Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material.").

Therefore, Solar Liberty adequately has alleged materiality.

### D.  Scienter

"[T]o satisfy Rule 9(b), conditions of a person's mind, including knowledge, may be alleged generally rather than with particularity."  *Kane,* 120 F. Supp. 3d at 395.  Nevertheless, and "[a]lthough scienter may be demonstrated by inference under Rule 9(b), that is not a 'license to base claims of fraud on speculation and conclusory allegations.'"  *Wood*, 328 F. App'x at 750 (quoting *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991)).

Advanced Energy contends that "Solar Liberty makes conclusory statements . . . about Advanced Energy's purported knowledge but does not allege any specific events

24

or other specific factual basis that gives rise to a 'strong inference of fraudulent intent,' as required."  Docket Item 11-1 (quoting *United States ex rel. Grupp v. DHL Exp. (USA), Inc.*, 47 F. Supp. 3d 171, 178 (W.D.N.Y. 2014), *aff'd sub nom. U.S. ex rel. Grupp v. DHL Worldwide Exp., Inc.*, 604 F. App'x 40 (2d Cir. 2015)).  This Court again disagrees.

Solar Liberty alleges that "Advanced Energy was aware since at least December 2013" that its solar inverters failed at rates up to 50% but told Solar Liberty that the failure rate was 1%-4%.  *See* Docket Item 14-2 ¶¶ 18-19.  That allegation alone is sufficient to demonstrate scienter.  *Cf. Grupp*, 47 F. Supp. 3d at 177 (finding no claim of scienter where the complaint contained only "conclusory allegation[s] of fraud, based solely on a disputed interpretation of the contract documents").

To be sure, Advanced Energy may have valid factual defenses to Solar Liberty's claim.  But that is not a viable argument on a motion to dismiss.  At this early stage of the litigation, Solar Liberty's claim under the NYFCA may proceed.

## CONCLUSION

For all those reasons, this Court DENIES Solar Liberty's motion to remand, Docket Item 7; DENIES Advanced Energy's motion to dismiss, Docket Item 11; and GRANTS Solar Liberty's cross-motion to amend, Docket Item 14.  Solar Liberty shall file

its second amended complaint **within seven days of the date of this decision and order**.

      SO ORDERED.

      Dated:  October 9, 2020
               Buffalo, New York

                        */s/ Lawrence J. Vilardo*
                        LAWRENCE J. VILARDO
                        UNITED STATES DISTRICT JUDGE